The HENRY B. GILPIN COMPANY and
Mooney-Kiefer-Stewart Co., Inc.,
Defendants-Appellants,

v.

David MOXLEY, Plaintiff-Appellee.

No. 2–680A196.

Court of Appeals of Indiana,
Fourth District.

May 5, 1982.

Thomas G. Stayton, James H. Ham, III, Ralph F. Hall, Baker & Daniels, Indianapolis, for appellants.

Arthur H. Northrup, Indianapolis, for appellee.

MILLER, Presiding Judge.

Appellants The Henry B. Gilpin Co. (Gilpin) and Mooney-Kiefer-Stewart Co., Inc. (MKS) are appealing an adverse summary judgment rendered in favor of appellee David Moxley for amounts due under three notes of MKS guaranteed by Gilpin. Gilpin MKS contend the trial court's judgment is erroneous because 1) there existed genuine issues of material fact concerning their affirmative defenses of waiver and estoppel as to Moxley's right to claim default and accelerate the debt; and 2) there was insufficient evidence in the record to support the $8,500 attorney fee award. Because the record reveals Gilpin and MKS did not present affidavits establishing any issue of material fact with respect to their alleged defenses of waiver and estoppel, we affirm the trial court's judgment regarding liability under the notes. However, we reverse the award of $8,500 in attorney's fees (since there was insufficient evidence to support such award) and remand for further proceedings on that issue.

## FACTS

On August 10, 1979 Moxley filed a multicount complaint against Gilpin and MKS, the third count of which constituted a claim by Moxley for amounts allegedly due under three notes of MKS guaranteed by Gilpin. Specifically, count three alleged that as a consequence of MKS and Gilpin's default of a quarterly interest payment due under the three notes on July 1, 1979, Moxley had elected to accelerate immediately the entire remaining amounts on the notes plus their stated interest, for a total of "$56,390.98 with interest at 7% a year from April 1, 1979 until judgment." The count also requested $14,097.75 in attorney fees and costs.

Moxley attached as exhibits to count three of his complaint the three promissory notes of varying amounts in which MKS agreed to pay to the order of Moxley equal annual installments of principal payable each January 2, and interest (7% per year) on the outstanding balance of principal, payable on the first day of each calendar quarter commencing on April 1, 1977. Each note was "unconditionally guaranteed" by Gilpin in the event of one or more instances of default as specified by the notes. One such instance of default was defined as when "[MKS or Gilpin] shall not pay when due any installment of principal or interest on this Note when due and such payment shall not be remedied within a period of thirty (30) days." With respect to Moxley's right to accelerate payment the notes provided "if such events of default [as defined] be continuing, the payee hereof [Moxley] may declare this Promissory Note due and payable whereupon the outstanding principal balance and accrued interest thereon shall forthwith be due and payable without other notice of any kind." In a separate guaranty document Gilpin agreed to guarantee "the full and prompt payment, when due, whether by acceleration or otherwise, together with interest and all costs, expenses and attorneys' fees" of the notes in the event MKS

> "shall fail to pay all or any part of the liabilities when due, whether by acceleration or otherwise according to the terms of the Promissory Notes evidencing the

Liabilities so that a 'default' shall have occurred as defined in said Promissory Notes, the undersigned will, within thirty (30) days after written demand, pay the amount due and unpaid by Debtor [MKS] as aforesaid, in like manner as if such amount constituted the direct and primary obligation of the undersigned. Payee [Moxley] shall not be required, prior to any such payment by or demand on the undersigned, to make any demand upon or pursue or exhaust any of its rights or remedies against Debtor [MKS] or others with respect to the payment of any of the Liabilities."

In their answer MKS and Gilpin pleaded the affirmative defenses of waiver and estoppel. In particular, their answer alleged that on July 11, 1979 (during the 30-day grace period on their obligation to pay interest on July 1) Moxley executed a "settlement agreement" in which he agreed to accept "60% of the principal amount of his notes as full payment (including interest)." It was further alleged that in reliance on the settlement agreement MKS and Gilpin "did not pay the interest on the notes which was due and payable within thirty (30) days of July 1, 1979." MKS and Gilpin concluded their answer by asserting that Moxley had waived and was estopped from asserting any right he had to accelerate payment on the notes because he had executed the settlement agreement.

Upon Moxley's motion for summary judgment, the issues were framed as follows: Initially, Moxley filed an affidavit dated October 1, 1979, asserting that through April 1, 1979, MKS had been current on all payments of principal and interest, but that the July 1, 1979 interest payment had neither been tendered nor received. In response, a counter-affidavit was filed in purported support of the theory there were material factual questions of waiver and estoppel which would make summary judgment for Moxley inappropriate. In this regard, James E. Allen, Jr., executive vice-president of Gilpin and president and treasurer of MKS, asserted that on July 11, 1979 Moxley accepted an offer by Gilpin to pay 60% of the face value of the notes in full settlement. Attached to Allen's affidavit was a document entitled "Settlement Agreement" which was signed by "David Moxley" and which provided:

"[I]n consideration of the acceptance by other creditors of a similar plan of payment and intending to be legally bound, the undersigned agrees to accept from the Henry B. Gilpin Company payment of sixty percent (60%) of the face amount of the undersigned's claim against the Henry B. Gilpin Company within thirty (30) days from July 12, 1979 in full satisfaction of the said claim."

According to Allen's affidavit, in June, 1979 Gilpin's net worth was substantially tied up in fixed assets and thus not readily available to pay creditors such as Moxley. Consequently the company formulated a plan to rectify their liquidity problems. A part of the plan called for the sale of certain fixed assets in order to pay all unsecured creditors. On June 15, 1979, as part of this rehabilitation effort, Gilpin extended an offer to all its unsecured creditors, including Moxley, whereby Gilpin would pay them 60% of the face value of their claims, including unmatured claims, in full settlement. This written proposal was mailed to Moxley and the other unsecured creditors on or about June 15, 1979. By July 11, 1979 a majority of the unsecured creditors, including Moxley, had accepted the June 15 offer.

Meanwhile, pursuant to an invitation in the June 15 offer, a creditors' meeting was held on June 29, 1979 and the creditors elected a "Creditors' Committee." According to Allen, Gilpin's ability to perform the June 15 offer by August 12 was discussed at the meeting as well as the creditors' desire to protect themselves by seeing that Gilpin avoid bankruptcy proceedings. As stated by Allen, "[b]ankruptcy would lead to forced sales of the assets at distress prices, be costly and result in recovery for the unsecured creditors far less than the 60% offered. The creditors accordingly instructed the Creditors' Committee to work with Gilpin Management in improving [the June 15 offer] or replacing [it] with an

agreement affording greater protection for the creditors." Allen's affidavit did not specifically assert, however, that Moxley had participated in the June 29 meeting of creditors, although Allen stated he had personally attended the meeting.

On August 10, 1979 the Creditors' Committee and Gilpin "executed" a *new* offer designed to afford Gilpin's unsecured creditors greater protection than the June 15 offer—"specifically to permit Gilpin to continue as a going concern and to minimize the threat or effects of a bankruptcy proceeding." The August 10 offer was mailed on or about August 15, 1979 to all Gilpin and MKS' unsecured creditors, including Moxley, for their acceptance. Like the June 15 offer which had been accepted by Moxley, Gilpin proposed in the new offer to pay the creditors a sum equal to 60% of their claims in full settlement; however, the new offer called "for payment to be made as follows: 1) 10% on or before September 1, 1979; 2) the remaining balance on or before March 1, 1980." The new offer also provided that "[c]reditors not assenting to or joining in this Agreement shall have funds payable to them retained under the Escrow Arrangement for distribution to Debtor upon termination of this Agreement." (The proposal called for the net proceeds of the sale or mortgage of any real property owned by Gilpin or its subsidiaries to be deposited in an Escrow Fund for distribution to accepting creditors.) In addition the new proposal stated that "to supersede [Gilpin's] offer of June 15, 1979, [Gilpin] has agreed with the request of the Creditors' Committee to withdraw the June 15, 1979 offer and substitute the [new agreement]." Significantly, Allen admitted in his affidavit that according to this new agreement "Gilpin was precluded from paying any creditor pursuant to the June 15 offer" which Moxley had accepted. Allen's affidavit also noted all the creditors of MKS except Moxley accepted the August 10 proposal.

In a letter dated September 29, 1979, Moxley made a written demand on Gilpin for payment of the entire remaining balance on the notes, plus interest and attorneys' fees. In response to this demand Gilpin mailed Moxley two checks each in the amount of $789.47 as payment for the July 1 and October 1, 1979 quarterly interest payments under the notes. Moxley returned both checks to Gilpin by way of a letter dated October 22, 1979.

As noted above, Moxley's motion for summary judgment on count three was granted by the trial court and this judgment forms the basis for the present appeal.[1] In entering its ruling, the trial court made findings which provide in relevant part:

"The Court specifically finds that the Defendant Mooney-Kiefer-Stewart, Inc. defaulted on said notes by failure to make interest payments when due on July 1, 1979 or within the grace period thereafter, that the Plaintiff was entitled to and did accelerate the entire unpaid balance pursuant to the provisions of said notes and gave the Defendant, The Henry B. Gilpin Company, written notice of such default on interest and principal and written demand to make good on said default, that the guarantor, The Henry B. Gilpin Company failed to pay the unpaid balance of principal and interest on said notes within a sixty day period after written notice and has not paid the same to this date and that the Plaintiff is entitled to judgment in the full amount due on said notes against Mooney-Kiefer-Stewart Inc. as the maker of said notes and also against The Henry B. Gilpin Company as the guarantor thereof ... [plus] interest as provided in said notes at the rate of 7% a year from the date of the last payment of interest, namely April 1, 1979 to the date of this Judgment.

.     .     .     .     .

1. The judgment left several counts of the complaint pending; consequently it disposed of fewer than all the claims presented to the trial court. However, the trial judge (1) expressly determined in writing there was no just reason for delay, and (2) expressly directed, in writing, the entry of judgment thereon. Thus the judgment is final and appealable. *Stanray Corp. v. Horizon Constr. Inc.,* (1976) 168 Ind.App. 164, 173, 342 N.E.2d 645, 651; Ind.Rules of Procedure, Trial Rules 54(B) and 56(C).

Interest hereafter is due on this judgment as provided by law. The Court finds that the reasonable fee for the Plaintiff's attorney in the collection of said notes is $8,500.00 and that such attorney's fee is due Plaintiff for his attorney's fees as provided in said notes and said guaranties.... Judgment should be entered for said principal amount interest and attorney's fees in the total amount of $56,254.36 on said notes pursuant to amended Count III."

## DISCUSSION AND DECISION

### Waiver and Estoppel

On appeal MKS and Gilpin confine their contentions to the assertion that material factual questions allegedly raised by the affidavits make summary judgment inappropriate. In this regard, they contend a trier of fact could conclude Moxley's "participation in the efforts of MKS and Gilpin to work out their cash flow problems" could establish 1) that Moxley made a knowing waiver of any rights he may have had arising out of the failure to pay interest on the notes in July, 1979; or, alternatively, 2) that Moxley "induced and agreed" to their failure to make the interest payment and is therefore estopped from suing under the notes.

Of course, it is well-settled that summary judgment is proper only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Criss v. Bitzegaio,* (1981) Ind., 420 N.E.2d 1221, *citing* Ind.Rules of Procedure, Trial Rule 56(E); *Shideler v. Dwyer,* (1981) Ind., 417 N.E.2d 281; *Bassett v. Glock,* (1977) 174 Ind.App. 439, 368 N.E.2d 18; *Letson v. Lowmaster,* (1976) 168 Ind.App. 159, 341 N.E.2d 785. Moreover, in summary judgment proceedings, as at trial, the burden of establishing the existence of material affirmative defenses is on the defendant. *Criss v. Bitzegaio, supra* at 1224–1225, where the Court concluded "defendants presented no evidence in support of their allegations" that plaintiff's action to obtain an undivided one-third interest in land by virtue of a resulting trust was barred by the statute of limitations, the doctrine of laches, or the statute of frauds.

In the instant case, Gilpin and MKS have not specifically contended summary judgment was inappropriate as a matter of law, but rather have essentially limited their argument to the theory the affidavits established material issues of fact in support of their affirmative defenses. Before applying to the case at bar the principles of summary judgment discussed above, however, it is helpful to consider the law pertaining to common law composition agreements, since it is Gilpin and MKS's assertion there were factual issues involving Moxley's settlement agreement with MKS, Gilpin, and the other creditors.

It has been stated in 6 Corbin on Contracts § 1283 at 141–43 (1962):

> "A composition with creditors is an agreement between a debtor and two or more of his creditors, or between such creditors for the benefit of the debtor, or between such creditors and any outside person, whereby the creditors agree to accept in full satisfaction something different from or less than that which they originally claim.
>
> This agreement may take different forms ... It is most commonly a bilateral contract whereby the debtor promises to render the substituted performance and the creditors promise to receive it in full satisfaction. Such a composition agreement is an accord executory, resulting in a satisfaction and discharge of the original claims only when the new performance is rendered. After it is made, however, unless the contrary is clearly agreed on, it operates as a suspension of the original claims as long as the debtor has committed no material breach of it. It is an enforceable contract, so that either the debtor or the creditors can maintain action thereon in case of breach by the other party. *In case of breach by the debtor, the creditors have alternative rights: they can maintain suit on their original claims or on the accord itself.*" (Footnotes omitted.) (Emphasis added.)

The validity of a composition does not depend on assent by all the creditors, *Devou v. Ham*, (1861) 17 Ind. 472, unless the composition by its own terms is conditioned on all or a specified portion of the creditors joining. *Falconbury v. Kendall*, (1881) 76 Ind. 260; *see* 1 S. Williston, a Treatise on the Law of Contracts § 126 at 522 (3d ed. 1957 & Supp.1981). "The consideration which upholds [composition] agreements is the mutual promises between the creditors themselves, whereby they each agree for the benefit of all to forego some right which they might enforce against their common debtor." *Atlas Engine Works v. First National Bank of Seymour*, (1912) 50 Ind.App. 549, 553–54, 97 N.E. 952, 953; *accord, Reinhardt v. Tommy Burns Painting & Decorating Co.*, (1964) Tex.Civ.App. 383 S.W.2d 72; *see Vinylast Corp. v. Gordon*, (1973) 10 Ill.App.3d 1043, 295 N.E.2d 523. In addition, creditors who do not enter into a composition agreement which others have agreed to may proceed to collect or to settle their claims in their own way. *Atlas Engine Works v. First National Bank of Seymour, supra.* With respect to the rights and liabilities of parties upon either performance or breach of a composition agreement, our Supreme Court has stated:

"If the debtor performs his part of the agreement, no action will lie for the original debt. *But if he fails in good faith to perform his part of the agreement, the creditor has his action upon the original debt.*

And he might also have an action upon the composition agreement, for any damages that he may have sustained on account of any breaches of the same. *While the creditor might rely upon the composition agreement alone, yet if it was not complied with by the debtor, he would have the right to elect to enforce the payment of the "original debt."* (Citations omitted.) (Emphasis added.)
*Bailey v. Boyd*, (1881) 75 Ind. 125, 127.

With these principles of composition in mind, we conclude summary judgment was properly awarded in Moxley's favor in the instant case, since MKS and Gilpin have established no material issues of fact with respect to their affirmative defenses of waiver and estoppel so as to prevent Moxley from recovering under the original indebtedness. It is not disputed by either party that Moxley "participated" in settlement efforts to the degree that he entered into the *initial* composition agreement. However, Gilpin and MKS also conceded in their affidavit that pursuant to the second composition offer which they "executed" with the Creditors' Committee on August 10, 1979, they were precluded from performing under the (first) agreement signed with Moxley, which they "withdrew." Contrary to the position taken by Gilpin and MKS on appeal that a creditor may never sue on an original debt once he enters into a composition agreement,[2] it is apparent under the law of composition summarized above that he may so elect to sue on the original obligation when his debtor breaches or fails to perform in good faith his part of the composition agreement. *Bailey v. Boyd, supra.* Thus, it was incumbent upon Gilpin and MKS—having admitted such failure—to sustain their burden by alleging further facts which would excuse them from performance under the composition agreement signed with Moxley. In this regard, as noted above, Gilpin and MKS recite merely that Moxley was invited to attend the June 29 meeting of creditors at which the second settlement offer was discussed—a fact which is neither disputed, nor supportive of their theories of waiver and estoppel,[3] since it is not alleged, for

2. In this regard they assert in their brief:
"By accepting the settlement offer, Moxley made a knowing and voluntary waiver of any rights he might have under the notes of MKS or guaranties of Gilpin arising out of the nonpayment of the quarterly interest installment in July, 1979. Alternatively he is estopped from relying upon the nonpayment of the July interest, which he induced and agreed to, as the basis of his lawsuit."

3. Although similar, the terms "waiver" and "estoppel" have been distinguished and defined as follows:
"A waiver is an intentional relinquishment of a known right and is a voluntary act, while the elements of estoppel are the misleading

example, that Moxley accepted the second offer, or even that he or his representatives in fact attended the meeting or encouraged the execution of such agreement. The record presented to the trial court is silent as to any acts of Moxley *after the execution of the initial composition agreement.* Accordingly, we conclude that Gilpin and MKS, like the defendants in *Criss v. Bitzegaio, supra,* have not met their burden of showing a material factual issue before the trial court in support of their affirmative defenses. Indeed, it is clear from this record the material facts were undisputed. For this reason, Gilpin and MKS have demonstrated no error on appeal with respect to the trial court's grant of a summary judgment.

## II. *Attorney Fees*

MKS and Gilpin also contend there was insufficient evidence before the trial court to support the attorney fee award of $8,500 and that, therefore, it was contrary to law and excessive. The evidence in this regard shows Moxley, a layman, stated in his October 1, 1979 affidavit that "on the basis of the amount involved and the time expended" his attorney's services were reasonably worth $8,000. In his December 20, 1979 affidavit Moxley stated further that he had employed other attorneys in Marion County (he did not say when or for what), and being familiar with their charges, he believed a reasonable fee for his attorney's efforts in the case up to that date would amount to $14,097.75. On appeal, Moxley contends his affidavits plus the extensive pleadings, motions, briefs and documentation showing the extent of his attorney's services were sufficient to support "an award of $8,500 on a $56,000 judgment, or 15% of the principal and interest recovered, [which was] in line with the long established rates of the Commercial Law League."

▪ The three notes and corresponding guaranties provided for payment of "attorneys' fees" in the event of default. In the

absence of a stipulation on the subject by the parties, however, it is error to add a sum for attorney fees to the amount otherwise due on a promissory note where it merely provides for "attorney fees" without indicating the amount, unless evidence is heard which fairly tends to prove how much is due. *Kindel v. French,* (1921) 190 Ind. 595, 131 N.E. 227. A finding by the court as to the value of an attorney's services should be supported by testimony or evidence. *Sears, Roebuck & Co. v. State,* (1967) 248 Ind. 169, 225 N.E.2d 175.

▪ This court recently held evidence at trial that a client had been charged a $30,000 attorney fee, plus evidence that the attorney had filed various pleadings, motions and proposed findings of fact and conclusions of law to be insufficient evidence to support an attorney fee award. *U. S. Aircraft Financing, Inc. v. Jankovich,* (1980) Ind.App., 407 N.E.2d 287. In that case we noted:

"Litigants and courts would be well advised to examine the factors set forth in the *Code of Professional Responsibility,* DR 2–106(B) in determining what evidence they should consider in preparation for trial or when deciding the amount to be awarded. These principles create a more objective foundation for a determination of fees rather than the subjective reaction of the trial judge, no matter how learned or experienced he or she may be.

There is no foreseeable hardship in establishing the amount of fees by way of the procedure we have outlined. Most lawyers maintain time records or can estimate their time spent on a particular case with some accuracy. The same is true with out-of-pocket expenses. Further, if it is felt the legal work performed justifies a higher than normal fee, there is no reason why testimony regarding the difficulty or complexity of a case should not be introduced. Any imposition upon or embarrassment of a lawyer forced to prove his fees in open court should be

---

of a party entitled to rely on the acts or statements in question and a consequent change of position to his detriment."

*Hargis v. United Farm Bureau Mutual Ins. Co.,* (1979) Ind.App., 388 N.E.2d 1175, 1178.

minimal, especially when balanced with the fact that such a practice would tend to enhance the integrity of the legal profession in the eyes of the litigants and the public at large." (Footnotes omitted.) *Id.* at 407 N.E.2d 296. Furthermore, Ind. Rules of Procedure, Trial Rule 56(E) requires that supporting affidavits to be sufficient to ground a judgment must be made on personal knowledge, shall affirmatively show that the affiant *is competent to testify on the matters included*, and must set forth such facts as would be admissible in evidence. The assertion in an affidavit of conclusions of law or opinions by one not qualified to testify to such will not suffice. *E.g., Podgorny v. Great Central Insurance Co.,* (1974) 160 Ind.App. 244, 311 N.E.2d 640, (legal conclusions in an affidavit are insufficient to support summary judgment). In carrying out T.R. 56(E)'s mandate that supporting or opposing affidavits present admissible evidence, this Court recently observed that such affidavits should follow substantially the same form as though the affiant were giving testimony in court. *Coghill v. Badger,* (1982) Ind.App., 430 N.E.2d 405, (opinion on rehearing). Consequently, a court considering a motion for summary judgment should disregard inadmissible information contained in either supporting or opposing affidavits. *Coghill v. Badger, supra,* (mere assertion in a summary judgment affidavit as to an opinion of the effect of a conversation rather than a statement of the facts of the conversation was properly ignored by the trial court).

In the present case, there is no showing in Moxley's affidavits which would establish him to be competent to testify on the subject of attorney fees. As noted above, Moxley did not indicate when in the past he had hired attorneys or for what kind(s) of case(s); furthermore, there is no showing that Moxley is an attorney presently involved in the practice of commercial law in Indianapolis. As a layman, Moxley might qualify as an expert regarding reasonable attorneys' fees for the collection of promissory notes, *see State v. Maudlin,* (1981) Ind.App., 416 N.E.2d 477; however, there is no showing of such qualification in this record. Accordingly we conclude Moxley's assertions regarding the value of his attorney's services are insufficient to support the attorney fee award in the absence of admissible evidence including evidence such as the amount of time and labor required by the attorney, the difficulty of the questions presented to the trial court, the skill needed to perform the service properly, and the fee customarily charged in the community for similar services.

Reversed and remanded for further proceedings consistent with this opinion.

CONOVER and YOUNG, JJ., concur.